# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### November 13, 2013 Session

## STATE OF TENNESSEE v. DANIEL CLARKE DOYLE

**Appeal from the Circuit Court for Carroll County**
**No. 12CR77     Donald E. Parish, Judge**

**No. W2012-02745-CCA-R3-CD  - Filed January 17, 2014**

The defendant, Daniel Clarke Doyle, pled guilty to statutory rape, a Class E felony, in the Carroll County Circuit Court and was sentenced to one year and six months in the county jail, suspended to supervised probation upon serving eighteen days.  On appeal, he challenges the trial court's imposition of a sentence of split confinement instead of a grant of judicial diversion or full probation.  After review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which ROBERT W. WEDEMEYER and ROGER A. PAGE, JJ., joined.

C. Mark Donahoe, Jackson, Tennessee, for the appellant, Daniel Clarke Doyle.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Senior Counsel; Hansel J. McCadams, District Attorney General; and R. Adam Jowers, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTS

The twenty-three-year-old defendant, a coach and teacher at Huntingdon High School, was indicted for statutory rape by an authority figure and pled guilty to the lesser offense of statutory rape, as a result of his sexual encounter with a sixteen-year-old student.

The presentence report included the defendant's statement concerning the events:

In October, I saw [the victim] at a Brantley Gilbert concert.  She was

with a couple of friends and I was with a friend of mine. Not long after that, she told me that she went through one of my basketball player's phones to get my number and began texting me. She started finding ways to come by my classroom and want to talk. We texted each other some and it became flirtatious. She drove to my house on the 30th of November and while she was there, oral sex occurred. Immediately, I felt like I had done the most stupid thing of my life, and was overcome with remorse. She continued texting me but I realized how inappropriate this was and asked her to stop contacting me.

The presentence report also contained the following impact statement from the victim's father:

> [The victim] - being a vibrant - fun loving excellent student became sullen and quiet - coming home from school - going to bed and crying every day for months. She was belittled and called names in front of her peers and taunted by them constantly - at school and work. She begged to go to a different school for her senior year. She is an honest straight forward person looking forward to college and possibly a career in criminal justice. She should . . . not have been subjected to solicitation by a person who was her superior and one she should have been able to trust. There was even a Facebook page "Support [the defendant]" that devistated [sic] her and [her] family. Some adults blamed her. She was grounded at home - only allowed to go to school and work with no contact even with her friends which to a teenager is like a life sentence. The whole family has been adversely affected. [The defendant] took advantage of a naive 16 year old girl.

In addition, the defendant's psychosexual risk assessment, the victim's handwritten statement and victim impact statement, and the victim's mother's victim impact statement were added to the presentence report but placed under seal upon the defendant's request at sentencing. Seventy-four letters in support of the defendant were admitted as exhibits at the sentencing hearing.

At the sentencing hearing, the defendant testified that he was presently twenty-four years old and had been a Spanish teacher and assistant basketball coach at Huntingdon High School where the victim was a student. However, the victim was not a student in any of his classes. The defendant stated that the victim obtained his phone number from one of the players on the basketball team and sent him a text message. He acknowledged that he responded to her message and that it was wrong for him to do so. He admitted that it was wrong for him to have engaged in a sexual act with the victim and that he was in a position to and should have stopped it.

The defendant testified that he would abide by any conditions of probation imposed by the trial court and that he had obtained employment with Hasting Oil Company in Waynesboro. Since his arrest, he had been living with his parents. The defendant expressed his apology to the victim and her family, as well as to his family and other supporters for "let[ting] them all down."

On cross-examination, the defendant acknowledged that he had seen the victim at a concert, but he could not recall whether that was before or after she sent him a text message. The defendant stated that he and the victim sent each other text messages about "a couple a day" and that the messages became sexual in nature. He said that the victim sent him one or two photographs of herself, but he did not request her to do so. A copy of the text messages sent by the defendant to the victim on November 30, 2011, was introduced as an exhibit at the hearing. He admitted that he did not advise school officials that he and the victim were communicating via text messages, which was a mistake. After his sexual encounter with the victim, he told her that they needed to stop communicating because he was "overcome with remorse and guilt."

The defendant testified that he was aware that the victim worked at Sonic but denied going there for the express purpose of seeing her. He elaborated that "she would inform me of her hours, and if I happened to get thirsty at that time and wanted to go get something to drink, . . . there were occasions where that happened." However, he said that he "never just pulled up . . . just to talk or to chat or anything of that nature."

On redirect examination, the defendant stated that he had no ability to affect the victim's grades at school. He also stated that the exhibit of his text messages was one-sided and did not reflect the messages sent by the victim.

Glen Hayes, the retired Director of Athletics at Bethel University, testified that he knew the defendant when he was a student-athlete at Bethel and noted that the defendant was selected as an Academic All-American and received a prestigious academic award. Hayes thought the defendant was "an outstanding young man in every aspect" and that he had always represented himself, his family, the university, and the basketball team "in the very highest way." Hayes had no question whether the defendant would abide by all conditions of probation that the court placed on him, and Hayes would not hesitate in reporting the defendant to the authorities if he violated a condition. Hayes said that, even though he did not condone the defendant's actions, it did not change his opinion of the defendant. Hayes said that he would not feel uncomfortable leaving the defendant in charge of his home or anything from the university or being around any of his family members.

Ginger Boggess testified that she had known the defendant and his family for fifteen

years. She said she would not hesitate having the defendant around her children, ages eleven years, six years, and eighteen months, nor would she hesitate leaving her children in the defendant's care. She believed that the defendant would "do anything in his power to comply" with any conditions of probation imposed by the court, and she would report him if he failed to comply. She said that the defendant's actions did not change her opinion of him as being "trustworthy and respectful."

David Byrd, the principal at Wayne County High School in Waynesboro, Tennessee, testified that he was well-acquainted with the defendant and his family. Byrd elaborated that their families vacationed together, the defendant played basketball with Byrd's son, and he had the defendant in his class. Byrd said that the defendant was "a model student" in high school and was loved and respected by his teachers and peers. Although he did not condone the defendant's conduct, Byrd was confident the defendant had learned his lesson and would never engage in such behavior again. He said that, if the defendant was able to teach, he would "hire him in a minute."

Charles Hasting, the owner of Hasting Oil Company and the defendant's employer, testified that the defendant was "very gifted" and could do anything he wanted to do in the future. He had no reason to doubt the defendant and "would trust him in any type of work that we would have him do." If the defendant was placed on probation, the defendant could continue to work for him.

Leo Doyle, the defendant's father, testified that he had been the defendant's coach, pastor, and best friend. He said that the defendant, an only child, had been a great support to their family. Doyle agreed that the defendant made "an incredible mistake" and was "crushed emotionally" about what he had done. He recalled that the defendant was ashamed to go out in public for months and was very remorseful. Doyle said that the defendant could continue to live with him and his wife during the pendency of a probationary sentence. Doyle said he would report the defendant if the defendant violated his probation.

Defense counsel asked the court to take notice of the large number of supporters in the courtroom rather than calling any additional witnesses.

After the conclusion of the testimony, the court denied the defendant's request for judicial diversion or full probation and sentenced the defendant to one year and six months in the county jail, suspended to supervised probation upon serving eighteen days.

## ANALYSIS

The defendant argues that the trial court abused its discretion in denying his request

-4-

for judicial diversion or full probation.

Under the 2005 amendments to the sentencing act, a trial court is to consider the following when determining a defendant's sentence and the appropriate combination of sentencing alternatives:

(1) The evidence, if any, received at the trial and the sentencing hearing;

(2) The presentence report;

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and

(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

Tenn. Code Ann. § 40-35-210(b) (2010).

The trial court is granted broad discretion to impose a sentence anywhere within the applicable range, regardless of the presence or absence of enhancement or mitigating factors, and "sentences should be upheld so long as the statutory purposes and principles, along with any enhancement and mitigating factors, have been properly addressed." State v. Bise, 380 S.W.3d 682, 706 (Tenn. 2012). Accordingly, we review a trial court's sentencing determinations under an abuse of discretion standard, "granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." Id. at 707. In State v. Caudle, our supreme court clarified that the "abuse of discretion standard, accompanied by a presumption of reasonableness, applies to within-range sentences that reflect a decision based upon the purposes and principles of sentencing, including the questions related to probation or any other alternative sentence." 388 S.W.3d 273, 278-79 (Tenn. 2012).

Under the revised Tennessee sentencing statutes, a defendant is no longer presumed to be a favorable candidate for alternative sentencing. State v. Carter, 254 S.W.3d 335, 347

(Tenn. 2008) (citing Tenn. Code Ann. § 40-35-102(6)). Instead, the "advisory" sentencing guidelines provide that a defendant "who is an especially mitigated or standard offender convicted of a Class C, D or E felony, should be considered as a favorable candidate for alternative sentencing options in the absence of evidence to the contrary." Tenn. Code Ann. § 40-35-102(6).

A defendant shall be eligible for probation, subject to certain exceptions, if the sentence imposed on the defendant is ten years or less. Id. § 40-35-303(a). A defendant is not, however, automatically entitled to probation as a matter of law. The burden is upon the defendant to show that he is a suitable candidate for probation. Id. § 40-35-303(b); State v. Goode, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997); State v. Boggs, 932 S.W.2d 467, 477 (Tenn. Crim. App. 1996). In order to meet this burden, the defendant "must demonstrate that probation will 'subserve the ends of justice and the best interest of both the public and the defendant.'" State v. Bingham, 910 S.W.2d 448, 456 (Tenn. Crim. App. 1995) (quoting State v. Dykes, 803 S.W.2d 250, 259 (Tenn. Crim. App. 1990)).

There is no bright line rule for determining when a defendant should be granted probation. Bingham, 910 S.W.2d at 456. Every sentencing decision necessarily requires a case-by-case analysis. Id. Factors to be considered include the circumstances surrounding the offense, the defendant's criminal record, the defendant's social history and present condition, the need for deterrence, and the best interest of the defendant and the public. Goode, 956 S.W.2d at 527. Also relevant is whether a sentence of probation would unduly depreciate the seriousness of the offense. See State v. Davis, 940 S.W.2d 558, 559 (Tenn. 1997); Bingham, 910 S.W.2d at 456.

In State v. Hooper, 29 S.W.3d 1, 10 (Tenn. 2000), our supreme court outlined a non-exhaustive list of factors for determining whether a need for deterrence is present and whether incarceration is "particularly suited" to achieve that goal. These factors include:

(1) Whether other incidents of the charged offense are increasingly present in the community, jurisdiction, or in the state as a whole;

(2) Whether the defendant's crime was the result of intentional, knowing, or reckless conduct or was otherwise motivated by a desire to profit or gain from the criminal behavior;

(3) Whether the defendant's crime and conviction have received substantial publicity beyond that normally expected in the typical case;

(4) Whether the defendant was a member of a criminal enterprise, or

-6-

substantially encouraged or assisted others in achieving the criminal objective; and

(5) whether the defendant has previously engaged in criminal conduct of the same type as the offense in question, irrespective of whether such conduct resulted in previous arrests or convictions.

Id. at 10-12.

In determining if incarceration is appropriate in a given case, a trial court should consider whether:

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

Tenn. Code Ann. § 40-35-103(1). Furthermore, the defendant's potential for rehabilitation or lack thereof should be examined when determining whether an alternative sentence is appropriate. Id. § 40-35-103(5).

Moreover, following a determination of guilt by plea or by trial, a trial court may, in its discretion, defer further proceedings and place a qualified defendant on probation without entering a judgment of guilt. Tenn. Code Ann. § 40-35-313(a)(1)(A). A qualified defendant is one who is found guilty or pleads guilty or nolo contendere to the offense for which deferral of further proceedings is sought, is not seeking deferral of further proceedings for a sexual offense, a violation of section 71-6-117 or section 71-6-119, or a Class A or Class B felony, and who has not been previously convicted of a felony or a Class A misdemeanor. Id. § 40-35-313(a)(1)(B)(i). If the defendant successfully completes the period of probation, the trial court is required to dismiss the proceedings against him, and the defendant may have the records of the proceedings expunged. Id. § 40-35-313(a)(2), (b).

The decision to grant or deny a qualified defendant judicial diversion lies within the sound discretion of the trial court. State v. Electroplating, Inc., 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998); State v. Cutshaw, 967 S.W.2d 332, 344 (Tenn. Crim. App. 1997); State

v. Bonestel, 871 S.W.2d 163, 168 (Tenn. Crim. App. 1993), overruled on other grounds by Hooper, 29 S.W.3d at 9. As such, it will not be disturbed on appeal absent an abuse of discretion. Electroplating, 990 S.W.2d at 229; Cutshaw, 967 S.W.2d at 344; Bonestel, 871 S.W.2d at 168. To constitute an abuse of discretion, the record must be devoid of any substantial evidence in support of the trial court's decision. Cutshaw, 967 S.W.2d at 344; Bonestel, 871 S.W.2d at 168; State v. Anderson, 857 S.W.2d 571, 572 (Tenn. Crim. App. 1992).

In determining whether to grant diversion, the trial court must consider all of the following factors: (a) the accused's amenability to correction, (b) the circumstances of the offense, (c) the accused's criminal record, (d) the accused's social history, (e) the accused's physical and mental health, (f) the deterrence value to the accused as well as others, and (g) whether judicial diversion will serve the interests of the public as well as the accused. Electroplating, 990 S.W.2d at 229; Bonestel, 871 S.W.2d at 168. A trial court should not deny judicial diversion without explaining the factors in support of its denial and how those factors outweigh other factors in favor of diversion. Id. Because "judicial diversion is a form of probation, see Tenn. Code Ann. § 40-35-313(a)(1)(A)[,] . . . the trial court's findings regarding the defendant's suitability for full probation . . . apply equally to its decision regarding the defendant's suitability for judicial diversion." State v. Neil Thompson, No. W2008-00311-CCA-R3-CD, 2009 WL 1034519, at *13 (Tenn. Crim. App. Apr. 17, 2009) (citing State v. Vivian Braxton, No. W2004-02506-CCA-R3-CD, 2005 WL 3059435, at *9 n.4 (Tenn. Crim. App. Nov. 10, 2005), perm. app. denied (Tenn. Mar. 20, 2006)).

With conflicting results, panels of this court in State v. Kiara Tashawn King, No. M2012-00236-CCA-R3-CD, 2013 WL 793588, at *6-7 (Tenn. Crim. App. Mar. 4, 2013), perm. app. granted (Tenn. Aug. 14, 2013), and State v. Shanice L. Dycus, No. M2012-02297-CCA-R3-CD, 2013 WL 5371957, at *6-7 (Tenn. Crim. App. Sept. 25, 2013), discussed the impact of the supreme court decisions of Bise and Caudle on our review of a denial of judicial diversion. The panel in King concluded that the holdings in Bise and Caudle are applicable to diversion reviews by this court, while the panel in Dycus reached an opposite conclusion. Regardless of whether King or Dycus is followed in this matter, the result is the same.

In its ruling, the trial court first noted that, in determining the appropriate sentence for the defendant, it considered the evidence presented at the sentencing hearing, the presentence report, the defendant's psychosexual risk assessment, the statements submitted in support of the defendant, the victim impact statements, the principles of sentencing, and the arguments made by counsel regarding the various sentencing alternatives. The court also noted that it took into consideration the nature and circumstances of the criminal conduct, the evidence and information offered by the parties on mitigating and enhancement factors, as well as the

defendant's testimony.

The court determined that the defendant's sentence should be enhanced because the offense involved a victim and was committed to gratify the defendant's desire for pleasure or excitement, see Tenn. Code Ann. § 40-35-114(7); and the defendant occupied a position of trust as a public school teacher who the "community entrusts [with] . . . our most valued asset, our children," see id. § 40-35-114(14). With regard to the position of trust factor, the court additionally noted that the defendant "used his professional status and the access to a young female that it afforded to significantly facilitate this offense." As a mitigating factor, the court considered that the defendant's criminal conduct neither caused nor threatened serious bodily injury. See id. § 40-35-113(1).

The court stated that it considered the defendant's eligibility for various alternative sentences, including probation and judicial diversion. The court noted that the defendant bore the burden of demonstrating that he was entitled to judicial diversion.

As factors weighing in favor of an alternative sentence, the court noted that the defendant had a favorable social history and no prior criminal record and that "[h]is character, as revealed by his previous actions, [was] good, with the exception of the present offense." The court observed that the defendant's potential for rehabilitation was good and that it appeared likely the defendant would abide by the terms of an alternative sentence. The court found that the interests of society in being protected from future criminal conduct by the defendant were not great. The court determined that the facts and circumstances surrounding the offense were not particularly gross or heinous.

The court stated that it read and considered the various letters of support submitted on the defendant's behalf and was "impressed with the sincerity of the opinions expressed in each of those letters and by the witnesses who . . . testified as character witnesses[.]" The court noted that the information relayed by the witnesses and letter-writers suggested that the criminal conduct was out of character for the defendant.

The court determined that the defendant's abuse of a position of trust, the deterrent effect to others similarly situated and media attention received, and the need to avoid depreciating the offense were factors weighing against an alternative sentence. The court specifically noted that the defendant "took improper advantage of his position as a schoolteacher which led to a sexual relationship with a sixteen year old student. He failed to act as a professional and failed to act as an adult in interacting with a child." The court also found that the physical and mental health of the defendant weighed against an alternative sentence because "he is able to serve a sentence of confinement without danger to him[self]."

The court continued in its findings:

> It is also true that a period of confinement will provide a deterrent effect to others similarly situated.

> Unfortunately this sort of crime involving teachers is occurring too frequently across Tennessee. The offenses and the results of the court proceedings often receive media attention, as has been true, of course, in this instance. The Court affords great weight to this factor.

> The Court finds that a split sentence of confinement . . . is best suited to meet the purposes of our sentencing laws. A sentence of full probation would unduly depreciate the seriousness of this offense.

> It is important that teachers be reminded of the trust being placed in them by parents and by the public. And it's important that everyone be reminded that decisions have consequences, sometimes life-altering consequences.

> The Court has weighed all the statutory factors regarding probation and judicial diversion in arriving at a sentence that will serve the interest of the public and [the defendant].

> The competing interests have been compared. [The defendant] has not carried the burden of proof to show his qualification for judicial diversion nor full probation because of the competing need for . . . deterrence, the circumstances of this offense, and because the interests of the public in assuring accountability by those in positions to mold and influence our students require otherwise.

> The sentence here to be imposed by the Court is deemed to be the least severe measure which is necessary to achieve the purposes for which the sentence is imposed.

As detailed above, the trial court found several factors in favor of granting the defendant's request for full probation or judicial diversion but determined that those factors were outweighed by the nature and circumstances of the offense, the need for deterrence, and to avoid depreciating the offense. As to the nature and circumstances of the offense, the court was obviously troubled by the defendant's abuse of a position of public trust as a teacher at the victim's high school. The defendant counters that there was no proof that he

-10-

was "at any time in a position of trust or supervisory power over [the victim]" or that "he used his position of trust or power to accomplish the act[.]" However, the defendant acknowledged at the sentencing hearing that as a teacher at the victim's high school, communicating with the victim via text messaging was inappropriate and that, as a teacher, he was in a position to stop it and should have alerted school officials. Regardless of whether the defendant was the victim's teacher or coach, he was a teacher at the victim's school and there was an expectation that he refrain from having a sexual relationship with a student.

The defendant also asserts that there was no proof to support a sentence of split confinement based on a need for deterrence. However, the proof shows that the defendant knowingly engaged in an illicit relationship with the victim and also that the case generated a lot of attention in the community "beyond that normally expected in the typical case." Hooper, 29 S.W.3d at 11. Apparently, a Facebook page was created about the case, and a substantial number of people attended the sentencing hearing or submitted letters in support of the defendant, which demonstrate the attention the crime received in the community. While the fact the defendant received support in his community weighed in his favor, the publicity surrounding the case reflects the deterrence value of his sentence. Accordingly, the need to deter sexual contact between teachers and students was a sufficient basis to support the trial court's decision.

After our review, we cannot conclude that the trial court abused its discretion in denying judicial diversion and imposing a sentence of split confinement.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE